Happy to hear argument in our first case, Donell J. Blount. Good morning, Your Honor. May it please the Court? I'm Gabriel Gillette from Jenner & Block, Pro Bono Appointed Counsel for Movement Donell Blount. Mr. Blount moves this Court, as the gatekeeper under 28 U.S.C. 2244, for permission to file a second habeas petition in the District Court, based on a police report he alleges was suppressed. If I can, I'd like to make three quick points, and then I'd be happy to answer the Court's questions. First, as this Court has explained, the standard for 2244 is a relatively low bar, and Mr. Blount clears it, so long as his allegations warrant further exploration in the District Court. Second, the police report is unquestionably material. It contradicts the key testimony from the key witness in the case, undermines his credibility, and points straight at an alternative perpetrator. And third, Mr. Blount adequately alleges that the report was suppressed. There is no point where defense counsel relies on it, refers to it, uses it, or anything like that. There's no evidence she received the document, and based on its power, we think that is enough to let the District Court determine conclusively whether it was suppressed. What about the certificate of service suggesting that, in fact, counsel received the document? Your Honor, it does suggest counsel received it, but I think on the other side of the ledger… Aren't we supposed to presume that a certificate of service properly signed and attested to in the absence of any other evidence indicates that a party, opposing party, in fact, received whatever it was, in this case, discovery materials? Sure, Your Honor. I think the certificate of service in this case is general to the max. I mean, what it says is any documents that are attached to here, if there are any, were disclosed. And I take your point, but I think… What do you mean if there are any? I thought there were documents actually… That's what the certificate of service actually says. It's a generic certificate of service that they apparently… Doesn't a cover page identify a series of documents that are, in fact, attached to that largest set of papers? It identifies a series of documents, Your Honor. I think the difference is that nothing in that document suggests… Nothing after that document, I should say, suggests that defense counsel actually received it. And based on the power of the information… Well, what else could we require to suggest that defense counsel actually received it? Certificate of service is how that works. Sure, Your Honor. I mean, I think there are a number of things that you could require. It would be that either it's mentioned somewhere else in the record or there's some explanation for why it wasn't used at trial. That might be nice to have, but do you think it's actually required? It would be nice to have. And I think the way that the court sits as a gatekeeper under 2244, the question is not whether Mr. Blunt can prove that his counsel didn't get the document. It's whether the record conclusively forecloses that she received it. And I don't think it does because the evidence is so material. Because, I mean, if you look to the government's closing… Yeah, you think it's material. The government apparently didn't think it was material. The government here doesn't, but if you look to the prosecutor's words at closing at trial, and the Supreme Court says that's how you can judge materiality, what the prosecutor at trial says is it's got to be Mr. Blunt because Earl Thomas is 100% certain the person who attacked him is Thomas' height or shorter. The issue is that the suppressed document doesn't say that. It says that the attacker was Thomas' height or taller. It's inconsistent. The other thing that Thomas says at trial is he remembers nothing about the attacker except the height and the skin tone. But if you look back at the document, what it reflects is a very different description right after the attack. It says that Thomas described his attacker as having an angry demeanor, as having a thin build, as being a smoker. It describes a person that is fundamentally inconsistent with Mr. Thomas' testimony at trial. I don't – it's not unfair, I guess, to suggest – to tell us that the prosecutor honed in on that issue regarding the height. That's certainly fair. But I don't think it's fair to say that that was the only piece of evidence that the state relied – or the Commonwealth, in this case, relied on. I mean, there were other – there was other evidence, there were other witnesses who testified, and I think critical to this case is the forensic evidence that indicated, among other things, that your client's fingerprints were on documents found inside the safe. So I – when you talk about materiality, I think you have to talk about it in the context of the entire evidence. So tell us why you think even considering the entire record evidence, you still have a basis to seek a second petition for relief. Sure, Your Honor. There is physical evidence tying Mr. Blunt to Mr. Thomas' property. There's also physical evidence tying the other two alternative perpetrators to Mr. Thomas' property. Satterwhite is found with the car. Satterwhite's fingerprints are on the car. Mr. Spruill's ID is found in the trunk. And Mr. Blunt's story is that his fingerprints are on the evidence because he bought it from Spruill and Satterwhite. And I think the other piece of evidence that's pretty powerful to me is that Mr. Blunt took the rings that were Mr. Thomas' and he pawned them afterwards. Using his own ID, using his name, his address at a pawn shop that – where the owner knew who he was. To me, that's pretty inconsistent with the idea that he robbed Mr. Thomas. I mean, it would be pretty foolish to rob a man and then take the property and identify yourself to a licensed pawnbroker and certify that you didn't actually steal the documents, steal the evidence. And, I mean, it's true. Mr. Blunt's fingerprints are on the documents. But once Mr. Blunt testifies that the way his fingerprints got on all that stuff is that he was rifling through Thomas' trunk because he was considering whether to buy the property, it's perfectly consistent that his fingerprints are there. What Mr. Thomas' testimony is so critical for is tying Mr. Blunt to the actual crime, to Thomas himself and to Thomas' home. Thomas' testimony is the only thing that makes that connection. And without – if Thomas lacks credibility, if Thomas' testimony at trial is incompatible with his description of the attacker right after the attack, then that falls apart. And then what you have is a case where there's physical evidence pointing to three different people. Maybe that evidence might be sufficient, but I think there's a good reason to think the trial might have happened differently if when the government stands up at the end and says it's got to be him because the victim says it is definitely him solely based on height. Mr. Blunt can pretty easily say, but you described somebody different. You described somebody your height or taller, and I'm not your height or taller. I'm the only one with physical evidence that your height or shorter. That supports Mr. Blunt's defense, and it points clearly at the alternative perpetrators who both received immunity. They both had reason to lie. They both had tarnished credibility. I mean, Mr. Spruill in particular, he's the one that most closely matches the description in the suppressed evidence. The police files describe him as having a thin build, an angry demeanor, being taller than Mr. Thomas, and being a smoker. Wasn't there evidence in the record that in fact someone had measured his height and found him to be 5'11 or something like that? Sure, which is consistent with Mr. Thomas' initial description. I mean, Mr. Thomas gives a range that is shorter than 5'11, but I think the numbers are less important than the fact of my height or taller versus my height or shorter. Can I ask you a question about diligence? So do you dispute that in fact this evidence, the Brady evidence, was in the court file? No, Your Honor. Okay. If that's true, then why should we accept the notion that your client was diligent in waiting 11 plus years before bringing this second petition, given that the evidence was in the court file and given that he did not file this FOIA request until 11 years later? Sure. I think I have a couple of answers, Your Honor. The first is that under 2244, that's the sort of factual determination that the district court can make, and I think it's the Murphy case or the Walker case from this court that says very clearly that's the situation. Well, it can make it, I suppose, if we give the district court the opportunity, but can't we also decide as a matter of law that on this record that doesn't show diligence? You could, Your Honor, and I think as a matter of law, it doesn't show lack of diligence. There are plenty of FOIA-type cases where although the evidence isn't in the court file, it's in the public record, and the issue is could the petitioner have done FOIA earlier? And court after court says that's not our standard. The diligence standard is reasonable under the circumstances. It's were you looking for something, not were you looking in the right place? And I think to add to that, when you're talking about Brady evidence, it seems pretty unlikely that Brady evidence will be found in the court file. So I don't think it makes a ton of sense to say that the fact that it's in the court file makes this different because you wouldn't expect Mr. Blunt to look there first. You would expect him to file his other habeas petitions, which he did. He filed, he went through the state process, then he went through the federal process, then at that point is when he gets into the FOIA situation. And I think if anything, it really just points up another issue of fact that makes this case the sort that the district court should sort out. I mean, there isn't evidence, there isn't testimony about what exactly Mr. Blunt was doing and why he went to FOIA when he did. And I think that's the sort of situation, the sort of information, like suppression, that the district court is really situated to address. And I think I would point the court to the Wolf cases, or I think four of them, from the district court and then up here and back again. And it's an interesting case because what happens there is the district court first says, based on the papers, the evidence was not suppressed. The case gets up here and this court says, the papers aren't nearly as strong as you think they are. There are some alternate inferences you can make. Send the case back down to the district court. The court holds an evidentiary hearing, takes testimony from defense counsel, from prosecutors, and ultimately concludes that the evidence was suppressed. And in that case is another one where the court emphasizes in remanding the case that diligence is the sort of district court inquiry that is done the same way as suppression. I think that's the kind of situation that can happen here, that whatever the record looks like in this early stage, in this preliminary stage, we don't even have all of it despite our efforts, it might not be what the record actually shows once the district court, and presumably appointed defense counsel in the district court, can really sink their teeth into the case. And I think... Okay, can I ask you a question? So my fundamental problem with this case, I'm torn between two opposing places to go. As you pointed out, the standard here is you don't have to show very much in front of us. Go back to the district court, a whole different story. But your fundamental claim that this evidence that you say was withheld, I think you have kind of a tough road to show that actually is material. It's such a small difference in the world of differences. You know, I think I take your point, Your Honor. I see that the record as a whole is different, and I think that the Wolfe case is a pretty good example of this. I didn't remember it quite that way, but I will. I mean, I don't think the facts quite line up with these facts. They don't quite line up. But I take your point. You know, the overarching principle from Wolfe and Smith and Kyle from the Supreme Court is a single piece of impeachment evidence against a single witness can be material in the right situation. But this goes back to my problem is I'm not sure that this is impeaching evidence. I'm not sure. I understand your argument. Honestly, I do, and I have read it. But in this witness, I think it would be hard to say that he had lied, whatever he was saying. It didn't read to me that anybody would say that. Sure. I mean, I think if anything, Your Honor, especially starting from the position from Williams and Hubbard that describe how low the standard is in this situation, I think the question I'd actually flip it to you and say if you're not sure that it's immaterial, if this is a case where you're sort of going back and forth, that cries out for the district court to really get involved and make that determination. Because the 2244 standard, unlike in the initial case. But it's not if we're not sure that it's immaterial, we need to believe that it is material. Under the standard, no, Your Honor. The standard is a prima facie case that there's a possibility the district court will find that it's material. Material is the word, not that it is not immaterial. Sure, Your Honor. But it's that possibility. And I take from Judge Moss' questions that there is a possibility that the district court would find this is material. And I think that's what makes this sort of a case. I mean, an easy case is where the evidence is cumulative of what was actually discussed at trial or where there is some other identifying witness that puts Mr. Blunt at the scene or physical evidence at Thomas' home. There's none of that here. Proving a Brady claim is always difficult. At least my experience in this court, it's hard for somebody to prove a Brady claim, period. I can understand that, Your Honor. And I think that also reflects why there are a number of Brady cases that arise under 2244. And we cite a slew of them. It's the last page of our reply brief. These sorts of cases are not uncommon under 2244 because Congress specifically said, we don't want second and success habeas petitions, but we'll allow them in the sort of situation where something improper might have happened in the district court, where Brady is an example and another one I point you to is ineffective assistance. And under this court's cases, once authorization to file the second petition is granted, Mr. Blunt can raise an ineffective assistance claim in the district court, and that claim would be tested under 2244 like the Brady claim. And I think it presents the district court with an interesting opportunity to hear the claims in the alternative, which is to say if, as you're suggesting, Judge Diaz, that the information was not actually suppressed, that's okay because that would sort of point the path to an ineffective assistance claim to say under, for example, the Lafayette case, the defense counsel failed to look in the file, failed to use the evidence that was so powerful. But I think given the posture where we are today, it's difficult to make that claim. It's difficult to play out how this case could develop once the district court were able to get evidence from defense counsel and from prosecutors and dig deeper into the record that at this point all we have is just a trial transcript essentially and a motion from Mr. Blunt that says I had no idea this evidence was there. And when you look at it, to me at least, it seems very powerful in pointing out how material it would have been to undermine Thomas' credibility and really contradict his key testimony at trial. Thank you very much. Thank you. Good morning, Your Honors. And may it please the Court, Martine Ciccone for the respondent. I'd like to start with Judge Diaz's question about diligence. I think, Judge, you're absolutely right. The fact that there's been 17 years of time passed and we're talking about information that was apparently in the file suggests not only a lack of diligence, but I think generally points to the fact that this is simply not Brady evidence. And I heard my friend say, you know, it's not typical to find Brady evidence in a file. And I think that's exactly right. The reason that it's atypical to find Brady evidence in the defendant's own file is because by definition it's not Brady evidence. It's not withheld. Can you tell me where you made that argument in your brief? Your Honor, we did. It was in a footnote, right? There is a footnote with a reference to diligence. But I don't think the question strictly stays with diligence. I was just agreeing with Judge Diaz that 17 years is a long time to wait to find something in your own file. But I think the broader point goes to the question of whether it was withheld. Okay, I think you're entitled to rely on it for that. I'm not sure you've made a diligence argument straight up that we would honor at this point. I think that's fair, Judge Motz. But I think the broader point is that insofar as we're talking about evidence that was apparently in the file, and I don't hear my friend just talk a lot about the actual document that he recovered through FOIA. And I think that's because the actual information, the only arguably material information, is identical to the information that was in the file, at least the file that was submitted to the circuit court. And if you look to JA-53 as compared to JA-78, it's quite clear that the description of the suspect is identical on both of those pages. So that brings us to the question, what do we do about the fact that we have a certificate of service? And I agree with Your Honors that it would be unusual to not only look behind the certificate of service, but even for this gatekeeping purpose, to assume that it was not turned over. And I think that sort of reveals a flaw in the way that my friend describes the standard. I think it's fair to say he's describing a standard that looks like a pleading standard, it looks like a Rule 8 standard, and a Rule 8 standard that is perhaps even more lenient than we typically see in the complaint context. Because he's asking this court to essentially ignore what is in this record, which is evidence. I think probably the best reading of the record is that the evidence was turned over. And I understand that Williams and Hubbard discuss a low bar. I think it's telling that the place where Williams talks about the low bar in the Prima Fascia case, it's in the context of the understanding that these cases will typically be done in a 30-day review with an incomplete record. And this case is different, because we do have the benefit of the full state court record. So for that reason, I think it's fair to certainly recognize that we're looking at a reasonable possibility standard, but not to ignore the record as it stands, and rather to sort of assume against the facts in the record that this evidence wasn't turned over. Have you done any looking at cases like this, and the likelihood that they would come around and somebody would grant the writ here, and then the likelihood that those cases would ultimately, the defendant would ultimately prevail? Your Honor, I can't say that I've done a sort of full scope search, but I think, I have thought about that question, and I think one case that's really interesting is MacLeod, which my friend cites in his brief. That's a case where this court did grant the petition, and I would say the evidence is far stronger. Yeah, yeah, yeah. But it's always worthwhile, I guess, citing authority, which has better facts for you than the one at hand. But what we're most interested in is the case that looks closest to this one, right? And so on your you, you, not much of a claim, but a pretty low standard. Your Honor, I'm sorry, to finish the thought. I'm sorry to interrupt you. No, no. What I was going to say is it's interesting because in MacLeod the evidence was far stronger, and the petition was granted, the motion was granted. When the case went back to district court, the district court denied the petition, and this court upheld that. Well, I think that generally happens, and I think that your point that the evidence was stronger maybe defeats your point about anyway. I'm not sure that that necessarily proves that less strong evidence doesn't get you that hearing before the district court. It may demonstrate to you that the hearing is not going to be worth much because even if you had stronger evidence, you weren't going to prevail against it. But I don't know that it helps you too much by that first point. Your Honor, what I'm suggesting is I think in that case it's interesting because the evidence was very strong insofar as this court's decision to grant the motion. This court granted the motion. The district court ultimately denied the petition. This court upheld that and then also said that had he proceeded to the merits, he would have lost under 2254. So I guess insofar as I understand your Honor's sort of hesitation of, you know, this is a low bar at the gatekeeping function, but also the materiality here is very questionable, and I would submit there is no reasonable possibility that he will be able to show by clear and convincing evidence that no reasonable jury would have convicted him with this incremental impeachment evidence, which I'll get to in a minute. But if you're sort of thinking through what are the costs and benefits of granting the motion, I think Macriot is interesting because it's instructive as we sort of think through the next steps down the line. Should Mr. Blount get to district court? Should he even proceed past the 2254 stage? The Virginia Supreme Court's decision that the evidence was not material under Brady would be reviewed under the EDPA standard. And from my perspective, there is absolutely no question that decision wasn't unreasonable. But that really isn't what we're supposed to do here. It's not, Your Honor. I understand that's not the review that you're looking at. Insofar as you're weighing the costs and benefits of granting the motion, I do think that those things are relevant. But to get to the review that you are actually conducting, I think that the standard is, is there a reasonable possibility that ultimately, should he go to district court, he will be able to show by clear and convincing evidence that no reasonable juror would have convicted him if this evidence had been available at trial? And I think the answer to that is clearly no. As Your Honors were pointing out, this is not a case where the picture looks different. This is not a case where the theory at trial is different. The question of height. Can I ask you about, so you've identified the standard correctly, I believe. So then the question for us is how deeply are we supposed to delve into the merits in order to assess that given the stage at which we find ourselves? Your Honor, I think it is certainly not a full review of the merits. But this court does have the benefit of a full state court transcript here. And it's not, it doesn't take that much to realize how unhelpful this evidence is. As my friend discussed, it shows a description of the perpetrator as 5'6 to 5'8, 140 to 170 pounds. Mr. Blount is 5'6 and 150 pounds. The description matches him perfectly. It also doesn't match any of the other defendants. And I think this is key because my friend puts a lot of weight on the prosecutor's final statements about, you know, this one was too tall and this one was too tall and this one was just right. That remains true whether or not we even accept the description of the suspect as it was in the record, as it is in the allegedly withheld document. Mr. Sproul, even the shortest he could possibly be is 5'9. He is not identified by that document. But as Your Honor pointed out, he is not in fact 5'9. He's in fact 6 feet tall. Well, I don't know. I'm not exactly sure how tall he is given all the different descriptions of his height. He seems to change like a chameleon. Or even how tall anyone is. I mean, you know. There is some dispute in the record about whether both the victim and Mr. Blount are 5'5 or 5'6, but they're clearly both about that height. And how tall the witness is. It's identical. He's my size. He's shorter. He's taller. But Mr. Sproul, as Your Honor pointed out, one of the detectives testified that he measured Mr. Sproul during his police interview because, again, the height of the perpetrator was relevant from the very beginning of the investigation, and he found him to be 5'11 and 3 quarters. But I think more importantly. But, you see, we don't have that man measuring everybody, you know. Like when I measure my little grandsons and they want to be tall, they might get an extra inch or two, you know. That's true, Your Honor. And he might have wanted Mr. Sproul not to be the perpetrator. But I would also point out that Mr. Sproul testified before the jury, so the jury was able to assess his height, and the prosecutor mentioned this in his closing statements. He walked past the jury. And I think it's. Why didn't the prosecutor put on the record, maybe have them all stand together or do something to stand against the wall? I mean, there were all kinds of things he could have done to straighten this out. That's true, Your Honor. You're testing my recollection of the record. I actually think there was a motion to measure someone in front of the jury. I'm not sure which one it was. I think that's right. But anyway. But, Your Honor, the prosecutor did point out that both of these witnesses, Ms. Satterwhite and Sproul, both walked in front of the jury. And I think it's plain that if, in fact, Mr. Sproul was three inches shorter than the detective testified under oath that he was, no matter how incompetent Mr. Blount's counsel was, she likely would have pointed that out. And I say all of this to point out that in order for my friend to be correct, in order for this evidence to be truly material, let alone show by clear and convincing evidence that no reasonable jury would have convicted, it has to not only be true that the victim made a statement that the attacker was 5'6", 5'8", it has to also be true that Mr. Sproul was 5'9". And not only is that untrue under this record, it's also not new evidence. There is no standard under which the height of a witness who testified and who the detective testified specifically about his height, there is no standard under which that constitutes new evidence. And if that's true, then we're left with literally one inch. The materiality of this case and the possibility of him getting a 2254 petition, a 2244 petition, and ultimately, in his view, a new trial, turns on one inch in one description. And I would also point out, leaving aside for the moment all of the other evidence, which I'll get to, but this question of height and the question of the credibility of the victim was litigated extensively at trial. Well, not extensively enough for the government to make a clear record on this. I mean, we don't have the same person, the same police officer, giving the same measurements to all three of these people. I have to say that I think that these estimates of height, pretty, you know, I'd like to know what the expertise of the person is. I have trouble estimating people's heights. So maybe it's just I'm bringing impermissible personal experience to this. Your Honor, I understand. I appreciate that what one says about one's height. It's clear one might overestimate one's height. And you tell me that they marched through. If you had three people march through here, I don't think I could tell you their different heights. Well, I say that, Your Honor. And I'm not even sure I could tell you if they were different. But one marched in and then marched out, and then another one marched. Especially if we have two or three or four inches separating them. Your Honor, even if you have trouble with that, even if you have trouble with the idea that the jury would be able to effectively estimate the heights, I think it is clear that if, in fact, Mr. Spruill, who is and was the key alternative suspect, if he was, in fact, three inches shorter, not just because she might have seen him once or she might have seen him as he passed the jury, but if he was, in fact, three inches shorter, defense counsel had ample opportunity to make that point. And I would expect she would have made that point because, again, she would have seen him much more than just the time that he testified before the jury. But my point with respect to the evidence is that this question of height and the question, more importantly, the question of credibility of the witnesses and the credibility of the victim, this was extensively litigated. This was an 88-year-old victim. You see, you made that point about what counsel would have done, assuming cops, and I think that's a fair assumption. So why shouldn't we question the issue with respect to the documents and what she would have done or not done with the documents? Because she didn't do something that might suggest that she never received the materials that you say she, in fact, received. Well, Your Honor, I think there are two sort of stops on that train, the first being it's possible she received the materials and didn't see them, which would maybe perhaps raise questions about her confidence, but it would also just raise questions about the flow of documents prior to trial that could have been a sort of innocent mistake. But there's also a good reason why she wouldn't have used that document again. It's not inconsistent, really, with his later testimony, and it's certainly not inconsistent with Mr. Blount. Mr. Blount is 5'6 and 150 pounds. The description of that suspect is he is 5'6 and 140 to 170 pounds. The other alternative suspects, and nobody argues here that this is somebody else entirely. That's completely innocent with Mr. Blount's narrative. The other alternative suspects were 5'11 to 6 feet tall. So the sort of grand narrative of this case, these two were too tall, and he's just right. It completely withstands this arguably incremental impeachment. And I think that's sort of the big picture here, which is this trial looks very similar. Didn't the victim pick out different people at one point, pick out one of these other people? He did, Your Honor. The victim identified Mr. Stroll in a photo lineup.  Mr. Thomas was questioned about it. He explained why he did so. You may have questions about whether the jury should have determined that he was credible in light of that arguable mistake, but the jury made that determination. And this evidence, and I think that goes to the reason why it's very unlikely, and I would say to the point where it's not appropriate to grant this petition, it's so unlikely that this would have changed the outcome. It's just another piece of arguably inconsistent description among many arguably inconsistent descriptions. Well, how do we know how many is enough? I mean, I suppose that maybe had this additional evidence been presented, that might have been the straw that broke the camel's back and said, we just can't trust anything that the victim is saying. Well, it's Mr. Blount's burden to show ultimately at 2244 that by clarifying the evidence, there's no reasonable possibility or no reasonable juror would have convicted him. And I think that's an extremely high bar. And this very small piece of evidence doesn't reach it. And if I can address Your Honor's questions and points about the other evidence here, because the other evidence was persuasive. There is physical evidence in this case. There's fingerprints found on the items inside the safe, the papers that Mr. Thomas kept in the safe. Blount and only Blount's fingerprints are on those documents. So nothing in this arguably new evidence addresses that. Whether Mr. Sproul was 5'9 or 5'11 or 6 feet doesn't change the fact that in fact his fingerprints, and he is now the alternative suspect that my friend has sort of trained his attention on, his fingerprints are nowhere. They're not on the car. And they're certainly not on the evidence from inside the safe. And that does connect Mr. Blount to the house, because the victim testified that while he was being robbed, he heard his safe being open. He heard the papers being rustled inside. So there was a reason to expect that the attacker's fingerprints would be on those papers. And, in fact, they were. Can I ask you a broader policy question? I mean, you obviously have been privy to this. We all know that this happens. We've seen tragic, unfortunate circumstances where the government is absolutely certain about a defendant's guilt, only to find out 10, 25, 30 years later that a horrible mistake has been made. So you were talking about the costs and benefits of granting a writ like this and denying it. Why shouldn't that be part of the calculus in terms of the potential costs? Well, Your Honor, I think the task that Congress has given this court under AEDPA requires this court to play a gatekeeping role and to really assess the likelihood that he will succeed. So while I agree, Your Honor, that that's certainly a problem, I don't think it's a problem in this case, but I don't think it changes ultimately the job of this court to act as a gatekeeper and to screen these petitions. Most of them should not go through, and that was the balance that Congress set when it asked this court to serve this role. And there are benefits to – there are interests that these gatekeeping functions, not just this one under AEDPA, but all of the AEDPA screening tools serve, and that is, of course, comity and finality. This jury trial was 18 years ago. I don't know for certain, but I assume the victim is no longer living. He was 88 years old at the time. And so there are interests in serving finality and, of course, the comity of protecting the state's interests in their own criminal convictions. So while I agree that is certainly an interest that this court must bear in mind, there are other interests on the other side of the ledger as well. Yes, but I thought that was a really good question because this is such a preliminary stage, and all the interests that you have been emphasizing really have a very strong role to play if it went back to the district court. I mean, looking at this evidence right now, it looks like you'd be in good shape. You'd do that as an argument. You could write that down and it probably is a winner. But here, we have not many judicial or lawyer resources to just grant the writ and let you go down and let them try to make their case in the district court. And so that's where I think this whole balance and the very problem that Judge Diaz talked about comes in. I understand that, Your Honor. And, of course, this is not the bar he'll need to meet in the district court, but it is a bar nonetheless. And that's really my point here, that there's a reason that Congress has tasked this court with fulfilling this role. It is an important role. Were it not, there would be no sort of initial screening of 2244 petitions. Congress could have set the rule that this goes to the district court and the district court dismisses it. If at the motion to dismiss stage, he cannot meet the 2244 factors. But instead, Congress selected to ask this court to serve as a screening function. And I think the proper role for this court in exercising that function is to look and determine whether there is any reasonable possibility that Mr. Blount will be able to show. And, again, this court has the benefit of really everything that we're ever going to see in this case, with the exception of the question of whether the evidence was actually withheld. And I think you can assume, for the sake of this role, as the Virginia Supreme Court did, you can assume all of those facts in his favor and still make the determination that there is no reasonable possibility that he will be able to show to a clear and convincing evidence standard that no reasonable juror would have convicted him if this very small piece of evidence had been available at trial, which, again, is not inconsistent with Mr. Blount as the perpetrator and is inconsistent with both of the other alternative suspects. Okay. Thank you. Thank you, Your Honors. Mr. Gillette, do you have any rebuttal? Thank you. Your Honors, I'd like to make three quick points, if I can, on rebuttal. The first is about the standard, that it's not just, as my friend described it, that it's not a full standard you're dealing with or a full review of the record. It's a cursory review of the record under Williams and Hubbard and the other cases. And it's true that we have the trial transcript in this case, but we're missing a very key piece of evidence in the record, and that is anything from defense counsel and from the prosecutors about what happened then. In many of these cases, that affidavit from trial counsel is what springs the case and ends up, frankly, leading down a path of granting the writ entirely. The second point I'd make is about the merits. And I take Your Honors' questions that that's on your mind, even if it's really not supposed to be part of this. I guess two points there. The first is that I'm not suggesting that whether an inch of height is material here. I don't think the trial transcript reflects that. The key issue at the trial is this range of height. It's whether the attacker was Thomas' height or taller versus Thomas' height or shorter. When the prosecution goes through its closing argument, which is what you can look at as the key, the prosecutor lines that up, and he says, Thomas is 100% certain that the attacker is his height or shorter. And I'm looking around, and Satterwhite and Spruill, they're taller, and Blunt is shorter. At no point does the prosecutor go through and parse out one, two, three inches like that. And I think that shows why this piece of evidence is such a game-changer, because it's true that the alternative perpetrator theory was raised at trial. It's true that Mr. Blunt pointed to the other evidence and its weakness, and he undermined Thomas' credibility. But this document is the key to change the game, because this is the only thing that Mr. Blunt has to say, you used to describe the attacker in a very different way, and at a time when it was far more likely to be accurate. It was right after the attack, when you said the person was taller than you, angry, thin-billed, and a smoker. And now, I think it was eight months later, you have a different story, where you say literally all you remember is skin tone and shorter than me. I think that's the sort of situation where the witness's testimony evolves, that many other courts have found is material. And I point you to the Wolf case, where a single piece of impeachment evidence against the single source of direct evidence against the defendant, was enough to be material under Brady. Thomas, from the Southern District of New York, is a similar case. It's about height, and whether the initial description from the victim was accurate as compared to the later description. And I think I close with Judge Diaz's point, that it's not just that this is about justice and weighing this balance. This is Mr. Blunt's only shot. If you deny the motion, it cannot be appealed, it's not subject to a cert petition, it's game over. If you send it back, at least he has a chance, and maybe it's futile, but it's worth that chance. Thank you, Your Honor. Thank you. We will, Mr. Gillette, I understand you're court-appointed, is that correct? Yeah. Well, we very much appreciate your efforts. We couldn't do our work without lawyers like you, and you've done a fine job for your client. We will come down and greet the lawyers, and then go directly to the next case.
judges: Diana Gribbon Motz, Albert Diaz, Stephanie D. Thacker